UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JAMES WURTS,
*individually and on behalf of all others*
*similarly situated*,

                          Plaintiff,

          v.

WELLS FARGO BANK, N.A.,

                        Defendant.
-------------------------------------------------------------------X

**MEMORANDUM
AND ORDER**
25-CV-5605-SJB-ARL

**BULSARA, United States District Judge:**

Plaintiff James Wurts filed this action alleging that Wells Fargo Bank, N.A. ("Wells Fargo") allowed cryptocurrency scammers to steal nearly $ 100,000 from him by maintaining easily exploitable systems and failing to recognize several red flags with his account.  Wells Fargo has moved to compel arbitration pursuant to the terms of two arbitration agreements and to seal related exhibits.  (Def.'s Mot. to Compel Arb. dated Nov. 14, 2025, Dkt. No. 41-1; Def.'s Mot. to Seal dated Jan. 8, 2026, Dkt. No. 43-1).  Wurts opposes both motions.  (Pl.'s Opp'n to Def.'s Mot. to Compel Arb. dated Dec. 18, 2025 ("Pl.'s Opp'n"), Dkt. No. 41-5; Pl.'s Opp'n to Def.'s Mot. to Seal dated Jan. 8, 2026 ("Pl.'s Mot. to Seal Opp'n"), Dkt. No. 45).  For the reasons explained below, the motion to compel arbitration is granted, and the motion to seal is denied.

<u>FACTUAL BACKGROUND AND PROCEDURAL HISTORY</u>

Between January and June 2025, Wurts fell victim to a cryptocurrency investment scheme run by an unknown John Doe, who used an alias "Rocket Invest."  (Am. Compl. dated Oct. 7, 2025, Dkt. No. 6 ¶ 1).  Doe asked Wurts to transfer funds from his Chase

bank account to the cryptocurrency exchange, Coinbase.  (*Id.*).  When Wurts's initial wire transfer attempt failed, Doe asked him to change banks to Wells Fargo, because "Wells Fargo and Citibank are very friendly to users who wire to Coinbase or other cryptocurrency exchanges."  (*Id.* (cleaned up)).

**I.      Application Process and Deposit Account Agreement**

As a general matter, to begin the online application process to open a Wells Fargo account, an applicant provides their social security number and mobile phone number.  (Decl. of Brian McMahon ("McMahon Decl."), attached to Def.'s Mot. to Compel Arb., Dkt. No. 41-2 ¶ 5).  Wells Fargo then texts a One-Time Passcode ("OTP") to the applicant's mobile phone, and the applicant is then prompted to enter the OTP to confirm that the person applying for the account is same person possessing the mobile phone.  (*Id.*).

After filling in additional personal details, applicants are taken to a page entitled "Terms and conditions," where they are presented with two agreements: (1) an eSign agreement that provides Wells Fargo with authorization to use the applicant's electronic signature, and (2) Wells Fargo's Deposit Account Agreement ("DAA").  (*Id.* ¶ 8).  On the "Terms and conditions" page, each of the agreements is hyperlinked, and when an applicant clicks the hyperlink, it takes them to the full text.  (*Id.*).  At the bottom of the page, the applicant can click either "Cancel" or "I agree."  (*Id.* ¶ 9).  Immediately above the "I agree" button is the following text: "By selecting 'I agree,' I attest that I've read and agree to be bound by these terms and conditions.  They contain

2

terms governing electronic funds transfers, applicable fees, **binding arbitration clauses, and waivers of class action rights.**" (*Id.*). The DAA provides in relevant part:

> If you have a dispute with us, we hope to resolve it as quickly and easily as possible. First, discuss your dispute with a banker. If your banker or another Wells Fargo employee is unable to resolve your dispute, you agree that either Wells Fargo or you can initiate arbitration as described in this section.
>
> **Definition:** Arbitration means an impartial third party will hear the dispute between Wells Fargo and you and provide a decision. Binding arbitration means the decision of the arbitrator is final and enforceable. A dispute is any unresolved disagreement between Wells Fargo and you.
>
> **Wells Fargo and you each agree to waive the right to a jury trial or a trial in front of a judge in a public court.** This Arbitration Agreement has only one exception: Either Wells Fargo or you may still take any dispute to small claims court.

(2024 DAA, attached to McMahon Decl. as Ex. 4, Dkt. No. 41-2 at 38).

On May 9, 2025, Wells Fargo received an online application to open two deposit accounts, a checking and a savings account, in Wurts's name. (McMahon Decl. ¶ 11). The application process was initiated that day at 5:44 P.M. GMT from an iPhone and an IP address of 172.226.203.28. (*Id.*; Decl. of Aaron Hughes ("Hughes Decl."), attached to Pl.'s Opp'n, Dkt. No. 41-6 ¶ 10). Wells Fargo texted an OTP to Wurts's phone which was then entered into Wells Fargo's system. (Suppl. Decl. of Kim Nelson ("Suppl. Nelson Decl."), attached to Def.'s Reply, Dkt. No. 42-4 ¶ 12; Def.'s Reply in Supp. of Mot. to Compel Arb. dated Jan. 8, 2026 ("Def.'s Reply"), Dkt. No. 41-10 at 3 (noting there is no dispute that the phone number belonged to Wurts and citing an online source attributing the number to him)). After Wurts's account was opened, Wells Fargo sent OTPs to the same phone number on several occasions, which were entered to

3

confirm identity, including during online sessions when the account was used to make online wire transfers.  (Suppl. Nelson Decl. ¶ 14; Online Activity Spreadsheet 1, attached to Suppl. Nelson Decl. as Ex. 1, Dkt. No. 41-12).

According to Wells Fargo's audit log, Wurts clicked the "I agree" button at 5:47 P.M. on May 9, 2025, approximately three minutes after the online application process was initiated.  (McMahon Decl. ¶ 11).  Wurts, however, denies that he ever applied for a Wells Fargo account online—he claims he never filled out an online application, and never clicked "I agree" to any terms and conditions.  (Decl. of James Wurts ("Wurts Decl."), attached to Pl.'s Opp'n, Dkt. No. 41-7 ¶ 13).  Rather, he alleges that after cryptocurrency scammers directed him to change banks and open a Wells Fargo account, he went in person to a Wells Fargo branch with $ 1,000 in cash to open an account on May 23, 2025.  (*Id.* ¶¶ 8–9).  At the branch, no one told him that an account already existed in his name, so he believes that the branch staff simply deposited his $ 1,000 into the existing account, which was created using the same information he had provided to the scammers.  (*Id.* ¶¶ 11–12).

Wurts further alleges that the IP address from which the online application process commenced is not his IP address.  (*Id.* ¶ 15).  His forensic expert, Aaron Hughes, researched the 172.226.203.28 IP address using the American Registry for Internet Numbers ("ARIN"), and found that the IP address belongs to Akamai Technologies.  (Hughes Decl. ¶¶ 11–12; ARIN Search, attached to Hughes Decl. as Ex. 2, Dkt. No. 41-6).  Hughes thought this "seemed out of place," as "Akamai is known to be a content delivery network and cloud computing platform" and "the audit logs . . .

4

show an iPhone mobile device being used." (Hughes Decl. ¶ 13).  Hughes "would have expected the IP address to belong to the cellular or VPN provider used." (*Id.*).  To see if Wurts might be running a VPN service running through Akamai, Hughes asked Wurts to use his phone with the VPN he uses—a VPN provided by his iPhone—enabled.  (*Id.* ¶¶ 14–15).  Wurts did so, and the IP address displayed was 172.59.210.228, an IP address belonging to his mobile carrier, T-Mobile, which Hughes says "is consistent with the expected behavior of a consumer using an iPhone with the built-in VPN feature." (*Id.* ¶ 16; IP Address Screenshot, attached to Hughes Decl. as Ex. 3, Dkt. No. 41-6; ARIN Search, attached to Hughes Decl. as Ex. 4, Dkt. No. 41-6).  Apple and Akamai have a partnership by which an iPhone user's IP address is masked behind an Akamai address to enhance consumer privacy.  (Suppl. Nelson Decl. ¶ 17 (citing Kit Knox, *Powering and Protecting Online Privacy: iCloud Private Relay and Information for Akamai Customers*, Akamai (Mar. 2, 2022), https://perma.cc/K5PT-2475)).

In addition to collecting IP address data, when Wells Fargo customers log into their accounts, Wells Fargo automatically records other data—including a unique device identification number ("Device ID") for the customer's device, the type of device, and geolocation information associated with the device or IP address.  (*Id.* ¶ 4).  Wells Fargo's activity logs for Wurts's account show repeated logins from a mobile device with Device ID 174768541058668 (the "668 Device"), which alternately presented to Wells Fargo with either a T-Mobile or an Akamai IP address.  (*Id.* ¶ 18; Online Activity Spreadsheet 2, attached to Suppl. Nelson Decl. as Ex. 2, Dkt. No. 42-5).

## II.    Online Banking Registration and the Online Access Agreement

After a customer opens a Wells Fargo account, they can enroll in online banking to obtain online and mobile access to their accounts.  (Decl. of Kim Nelson dated Nov. 14, 2025 ("Nelson Decl."), Dkt. No. 41-3 ¶ 3).[1]  When a customer applies for online banking, they are prompted to enter their social security number and date of birth.  (*Id.* ¶¶ 4–5).  Next, the customer is given an option to update their mobile phone number.  (*Id.*).  They then must authenticate their identity to proceed—usually receiving an OTP by text message and entering the OTP.  (*Id.*).  Then, the customer creates a username and password for online access.  (*Id.*).

After completing all these steps, the customer is taken to a page entitled "ESIGN Consent and Online Access Agreement," asked to give consent to Wells Fargo using their electronic signature, and given the opportunity to accept or reject the terms of the Online Access Agreement ("OAA").  (*Id.* ¶ 6).  There are windows containing the full

---

[1] Wurts objects to Nelson's declaration, arguing that it is inadmissible hearsay because it fails the business-records exception, and alternatively, that it is no more than speculation.  (Pl.'s Opp'n at 14–15).  These arguments are meritless.  Nelson's declaration establishes that she, as a Senior Manager at Wells Fargo, has personal knowledge of the general process for applying for online banking—which is what her declaration sets forth.  (Nelson Decl. ¶¶ 2–3).  Those are business records, and in any event—the hearsay objection is misplaced in this procedural posture.  Motions to compel arbitration necessarily consider evidence outside the pleadings, and like summary judgment motions, are an exception to the hearsay bar, when, like here, the evidence consists of testimony based on personal knowledge, which would otherwise be admissible at trial.  *See, e.g.*, *Worthington v. JetSmarter, Inc.*, No. 18-CV-12113, 2019 WL 4933635, at *5 n.3 (S.D.N.Y. Oct. 7, 2019) (finding declaration of company's Chief Technology Officer and evidence presented therein regarding "the steps a user takes to register on the JetSmarter app" admissible on motion to compel arbitration because "the materials would otherwise be admissible at trial" (citing *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001))).

text of the eSign agreement and the OAA, with scroll bars allowing the customer to scroll through and review the agreements, as well as a hyperlink to the full OAA. (Nelson Decl. ¶ 7). Customers are told: "[p]lease scroll and review in full." (*Id.*). The page has two checkboxes next to two acknowledgements, one for the OAA and one for eSign. (*Id.* ¶ 8). The OAA acknowledgement states: "I've read the Online Access Agreement and agree to be bound by the terms and conditions of using Wells Fargo's online and mobile services, including electronic funds transfers. I understand that the agreement contains a binding arbitration clause and a waiver of class action rights." (*Id.*). Underneath these check boxes are two buttons, one is labeled "No Thanks" and the other is labeled "I Agree." (*Id.* ¶ 9). While the "No Thanks" button can be clicked at any time, the "I Agree" button is inactive and grayed out unless the customer checks the box indicating they have read and agree to the OAA. (*Id.* ¶ 10).

The OAA provides in relevant part:

This Section constitutes the arbitration agreement between you and us ("Arbitration Provision"), and includes a mutual waiver of class action rights. It governs disputes about the following, which are known as "Covered Disputes":
- Interpretation of this Agreement (which includes this Arbitration Provision and whether a disagreement is a "dispute" subject to binding arbitration as provided for in this Arbitration Provision).
- The Service.
- The Online Access Process.
- Online Financial Services ("Covered Disputes"). . . .

. . . .

You and we agree that any Covered Disputes between or among you and us, regardless of when it arose, will, upon demand by either you or us, be resolved by the arbitration process described in Section (d) below. **You understand and agree that you and we are each waiving the right to a jury trial or a trial before a judge in a public court.**

7

As an exception to this Arbitration Provision, we both retain the right to pursue disputes in small claims court in the state where you reside if the dispute lies within that court's jurisdiction. . . .

. . . A dispute is any unresolved disagreement between or among you and us.  Disputes include:
- Claims based on broken promises or contracts.
- Torts (injuries caused by negligent or intentional conduct) or other wrongful actions.
- Statutory, common law, and equitable claims.
- Any disagreement about the meaning of this Arbitration Provision.
- Whether a disagreement is a "dispute" subject to binding arbitration as provided for in this Arbitration Provision.

. . . .

. . . You and we each agree that in this relationship:
- You and we are participating in transactions involving interstate commerce.
- The Arbitrator will decide any dispute regarding the enforceability of this Arbitration Provision.
- Each arbitration is governed by the provisions of the Federal Arbitration Act (Title 9 of the United States Code) and, to the extent any provision of that Act is inapplicable, unenforceable, or invalid, the laws governing the relationship between you and us about which the Covered Dispute arose.

(2024 OAA, attached to Nelson Decl. as Ex. 1, Dkt. No. 41-3 at 34–35).

Wells Fargo's audit logs indicate that online access authorization for Wurts's account took place from 12:54 P.M. to 1:08 P.M. on May 19, 2025.  (Suppl. Nelson Decl. ¶ 25; Online Activity Spreadsheet 1 at 1).  The process was commenced from a computer that presented to Wells Fargo via IP address 100.37.19.19.  (Suppl. Nelson Decl. ¶ 25).  Wells Fargo's audit logs, containing geolocation data, show that a mobile device with Device ID 174802930968618 (the "618 Device"), repeatedly presented with the same IP address, and logged in from Wurts's house.  (*Id.* ¶ 20; Online Activity

8

Spreadsheet 2; Decl. of Joseph N. Glynn ("Glynn Decl."), attached to Def.'s Reply, Dkt. No. 42-9 ¶¶ 2–4 (providing evidence of Wurts's Staten Island address)).  The 618 Device logged into Wurts's account on May 31, June 3, June 8, June 9, June 10, and July 11, 2025.  (Suppl. Nelson Decl. ¶ 20).  Each time, the device presented with IP address 100.37.19.19, and the geolocation data gathered—precise latitude and longitude coordinates—overlapped with Wurts's house.  (*Id.* ¶¶ 20–21).[2]

At 1:05 P.M., Wells Fargo texted an OTP to Wurts's phone number to confirm he was the one engaging in the online enrollment process, and the OTP was entered at 1:06 P.M.  (*Id.* ¶ 25).  At 1:08 P.M., "I Agree" was clicked with respect to the OAA, which completed the enrollment process and gave access to online and mobile banking.  (*Id.*; Online Activity Spreadsheet 1 at 1).  Wells Fargo did not capture geolocation data until after this point in the enrollment process, but at 1:08 P.M., right after online access became available, the first sign-in to the account occurred, from the same 100.37.19.19 IP address, and geolocation data reflected that the login for that session, and two other sessions a few minutes later, took place from Staten Island.  (Suppl. Nelson Decl. ¶ 26; Online Activity Spreadsheet 2 at 1).  Based on this evidence, Wells Fargo contends that the online enrollment process took place from Wurts's house, which is in Staten Island. (Suppl. Nelson Decl. ¶ 27).

---

[2] The 618 Device also logged in from the same locations as the 668 Device in the same time period.  (Suppl. Nelson Decl. ¶ 23).  For instance, both devices logged in from Florida on June 6, 2025, during a several-day period when Wurts was posting pictures on social media about a trip to Florida.  (*Id.*; Online Activity Spreadsheet 2 at 1; Facebook Posts, attached to Suppl. Nelson Decl. as Ex. 6, Dkt. No. 41-17).

Wurts ultimately transferred approximately $ 100,000 to the cryptocurrency scammers using Wells Fargo wire transfers.  (Am. Compl. ¶¶ 11, 37–41).  He filed this lawsuit on October 6, 2025, and the Amended Complaint asserts claims for unjust enrichment, constructive trust, violation of New York General Business Law Section 349, breach of the implied covenant of good faith and fair dealing, violation of New York Uniform Commercial Code Section 4-A, negligence, and aiding and abetting fraud on behalf of himself and a putative class, and additional claims for wire fraud and violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") against John Doe on behalf of himself.  (*Id.* ¶¶ 94–163).

## DISCUSSION

"[T]he Federal Arbitration Act (the 'FAA') creates a 'body of federal substantive law of arbitrability' applicable to arbitration agreements[.]"  *All. Bernstein Inv. Rsch. & Mgmt., Inc. v. Schaffran*, 445 F.3d 121, 125 (2d Cir. 2006) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).  "[B]ecause the FAA puts arbitration clauses 'on an equal footing with other contracts,'" *Certain Underwriters at Lloyds, London v. 3131 Veterans Blvd LLC*, 136 F.4th 404, 409 (2d Cir. 2025) (quoting *Coinbase, Inc. v. Suski*, 602 U.S. 143, 148 (2024)), an arbitration provision "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2; *see also Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 650 (2022) (explaining that Section 2 "renders agreements to arbitrate enforceable as a matter of federal law"); *Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp.*, 246 F.3d 219, 226 (2d Cir. 2001) (noting that Section 2 reflects "a

10

strong federal policy favoring arbitration as an alternative means of dispute resolution").

## I.    Motion to Compel Arbitration

### A.    Agreement to Arbitrate

"Arbitration is a matter of contract and consent, and . . . disputes are subject to arbitration if, and only if, the parties actually agreed to arbitrate those disputes." *Coinbase*, 602 U.S. at 145. "Questions concerning the formation and existence of an arbitration agreement must be resolved by courts in the first instance." *Olin Holdings Ltd. v. State*, 73 F.4th 92, 101 (2d Cir. 2023). Therefore, "parties may not delegate to the arbitrator the fundamental question of whether they formed the agreement to arbitrate in the first place." *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 251 (2d Cir. 2019) (citing *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299–301 (2010)).

"To determine whether parties agreed to arbitrate," the Court must "consider all relevant, admissible evidence submitted by the parties," drawing "all reasonable inferences in favor of the non-moving party"—a standard akin to summary judgment. *Davitashvili v. Grubhub Inc.*, 131 F.4th 109, 115 (2d Cir. 2025) (quotations omitted). The party seeking to arbitrate bears the burden on this threshold issue. *Id.* "If the party seeking arbitration has substantiated the entitlement by a showing of evidentiary facts, the party opposing may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried." *Oppenheimer & Co. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995).

11

"The threshold question of whether the parties indeed agreed to arbitrate is determined by state contract law principles." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016). The DAA and the OAA contain choice of law provisions. The DAA provides: "[t]his Agreement, your accounts, services and any related disputes are governed by United States law and (when not superseded by United States law) the laws of the state where your account is located (without regard to conflict of laws principles)." (2024 DAA at 42). Because Wurts's account was opened online, his account is located in New York, "the state associated with [his] home ZIP code at the time of account opening." (*Id.*; Glynn. Decl. ¶¶ 2–4 (providing evidence of Wurts's Staten Island address)). The OAA, on the other hand, provides "[t]his agreement will be read and interpreted according to the laws of the State of South Dakota." (2024 OAA at 39).

Wells Fargo concedes that the difference between New York and South Dakota law is "immaterial on this motion because 'traditional contract formation law does not vary meaningfully from state to state,'" (Def.'s Mot. to Compel Arb. at 11 n.40 (quoting *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 702–03 (2d Cir. 2023))), and the parties rely primarily on New York law, (*see, e.g., id.* at 3, 10–14; Pl.'s Opp'n at 8, 16, 26). This election resolves the choice of law issue—the Court applies New York law to decide whether the parties entered into an agreement. *See Martinez v. Bloomberg LP*, 740 F.3d 211, 223 (2d Cir. 2014) ("[P]arties by their acquiescence . . . may induce the trial court to assume that foreign law is similar to that of the forum, with the result that a court does not err when it articulates its decision by reference to the law of the forum." (quotations

12

omitted)); *e.g.*, *Robinson v. Macy's Inc.*, 772 F. Supp. 3d 253, 260 n.5 (D. Conn. 2025) ("Plaintiff does not object to Citibank's use of Connecticut law. This implied consent, combined with Citibank's reliance on Connecticut cases, is sufficient to establish choice of law regarding the acceptance of the cardholder agreement as that of Connecticut." (quotation omitted)); *Blodgett v. Siemens Indus., Inc.*, No. 13-CV-3194, 2018 WL 385477, at *5 (E.D.N.Y. Jan. 11, 2018) ("Plaintiffs' . . . citation solely to New York law in support of their . . . claims in their prior submissions is deemed by this Court to constitute an implied consent to use New York law, which settles the choice of law issue in favor of the application of New York law.").

New York law requires a "meeting of the minds" and a "manifestation of mutual assent" to form a binding contract. *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288–89 (2d Cir. 2019) (quoting *Express Indus. & Terminal Corp. v. N.Y. Dep't of Transp.*, 93 N.Y. 2d 584, 589 (1999)). Importantly, mutual assent does not require actual notice, because inquiry notice is sufficient: "[u]nder New York law, when an offeree does not have *actual* notice of certain contract terms, he is nevertheless bound by such terms if he is on *inquiry* notice of them and assents to them through conduct that a reasonable person would understand to constitute assent." *Davitashvili*, 131 F.4th at 115–16 (quotations omitted); *see also Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74–75 (2d Cir. 2017) (applying California law and noting even absent "actual notice of the terms of the agreement, the offeree will still be bound by the agreement if a reasonably prudent user would be on inquiry notice of the terms"); *Wu v. Uber Techs., Inc.*, 43 N.Y.3d 288, 299 (2024) ("[T]here is no requirement that a party have correctly understood—or even reviewed—the terms

13

presented by the offeror for their manifestation of acceptance to be effective.  Instead, courts ask whether the offeree was put on inquiry notice of the contractual terms.").  To determine whether an offeree has inquiry notice of a contractual term, "New York courts evaluate whether the term was obvious and whether it was called to the offeree's attention—an analysis that often turns on whether the contract terms were presented to the offeree in a clear and conspicuous way."  *Davitashvili*, 131 F.4th at 116 (quotations omitted).

This same inquiry applies to online contracts, and remains fact-intensive. *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 102 (2d Cir. 2022) (quotation omitted); *see also Edmundson*, 85 F.4th at 704 ("A reasonably prudent internet or smartphone user is on inquiry notice of contractual terms where the terms are presented in a clear and conspicuous way.").  "[C]ourts . . . evaluate visual evidence that demonstrates 'whether a website user has actual or constructive notice of the conditions.'"  *Zachman*, 49 F.4th at 103 (quoting *Nicosia*, 834 F.3d at 233).  "The outcome often turns on 'whether the design and content of th[e] webpage rendered the existence of terms reasonably conspicuous.'"  *Id.*  (quoting *Nicosia*, 834 F.3d at 233).

The notice Wells Fargo provided of the DAA and OAA clearly and conspicuously called attention to their arbitration terms.  As for the DAA, Wells Fargo presented customers with the DAA terms via hyperlink, and specifically called

14

attention to the agreement's arbitration terms in bold lettering immediately above the "I agree" button:



(McMahon Decl. ¶ 10).  And as for the OAA, Wells Fargo presented customers with both a window containing the full text of the agreement—with a scroll bar allowing them to scroll through and review the entire agreement—and a hyperlink to the full text of the agreement:



(Nelson Decl. ¶ 11).  Moreover, customers are told "[p]lease scroll and review in full."

(*Id.*).  And on the acknowledgement screen, Wells Fargo specifically calls attention to

the arbitration terms in the agreement:

16

(*Id.*).

These notices are sufficient to put an applicant on inquiry notice of the

arbitration agreements, even if they did not read the actual terms.  The screens are

"uncluttered," the text containing hyperlinks to the DAA and the OAA appears directly

above the buttons where a user indicates agreement, and the "hyperlinks are in blue

and underlined."  *See Meyer*, 868 F.3d at 78; *see also Edmundson*, 85 F.4th at 704 ("[W]hen

terms are linked on an uncluttered interface and temporally and spatially coupled with

the mechanism for manifesting assent and the user does not need to scroll beyond what

is immediately visible to find the terms, we have concluded, as a matter of law, that the

17

interface provided reasonably conspicuous notice of the existence of contractual terms." (quotation omitted)).

As for assent, Wells Fargo's agreements are "clickwrap" or "scrollwrap" agreements, ones routinely found to provide adequate notice of arbitration terms, because they "force users to 'expressly and unambiguously manifest either assent or rejection prior to being given access to the product.'" *Nicosia*, 834 F.3d at 233 (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 429 (2d Cir. 2004)); *Meyer*, 868 F.3d at 75 ("Courts routinely uphold clickwrap agreements for the principal reason that the user has affirmatively assented to the terms of agreement by clicking 'I agree.'").  Wells Fargo's agreements require customers to click an "I agree" button, expressly indicating their assent to the arbitration agreements, which are specifically mentioned in the text summarizing what they are agreeing to.  And the OAA process provides customers the opportunity to scroll through the entire OAA, including the arbitration provision, and requires users to check a box affirming that they "read the Online Access Agreement and agree to the terms and conditions of using Wells Fargo's online and mobile services" and "understand the agreement contains a binding arbitration clause and a waiver of class action rights."  (Nelson Decl. ¶ 11).

Wurts, however, contends that he never clicked "I agree" — to the DAA or the OAA — because he never completed the account application or online access registration processes at all.  (Wurts Decl. ¶¶ 13, 16–18; Pl.'s Opp'n at 6–7).  Although in some circumstances such an assertion alone can avoid arbitration, "the fact that a party's declaration can defeat a motion to compel arbitration does not mean it always will."

*Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 51 (2d Cir. 2022).  For instance, "a party's declaration will not create a material issue of fact in those rare cases where it is 'blatantly contradicted by the record, so that no reasonable jury could believe it.'"  *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

That is the case here—at least for the OAA.  Wurts's conclusory denial of agreeing to the OAA—which cites no evidence—is plainly contradicted by the evidence submitted by Wells Fargo.  Wurts plainly clicked "I agree" and assented to the OAA— including its arbitration provision—on May 19, 2025.  Wells Fargo's audit logs indicate registration for online access was commenced from a desktop or laptop computer that presented with IP address 100.37.19.19—an IP address that appears multiple times in the audit logs, (*see* Online Activity Spreadsheet 2), including in early June, when Wurts admits he accessed online banking, (*see id.* at 1–2; Wurts Decl. ¶¶ 17–18).  Wurts does not dispute that any of these other logins were him.  His expert only addresses the IP address presented during the DAA signing process.  (*See* Hughes Decl. ¶ 22).[3]  Wells Fargo has set forth geolocation evidence that the subsequent repeated logins from the 100.37.19.19 IP address are linked to Wurts's house.  (*See* Online Activity Spreadsheet 2; Suppl. Nelson Decl. ¶ 20; Glynn Decl. ¶¶ 2–4).  Moreover, neither Wurts nor his expert deny that the phone number to which Wells Fargo routinely texted OTPs—including

---

[3] In any event, though the expert report casts doubt on whether Wurts completed the account application process and assented to the DAA, it does not establish that it was not Wurts who communicated with Wells Fargo.  As Wells Fargo noted, an iPhone user may present with an Akamai IP address if using a certain VPN provided by Apple in partnership with Akamai.  (Suppl. Nelson Decl. ¶ 17).  And Wells Fargo's audit logs reflect other logins from IP addresses that also belong to Akamai, from a device that seems to belong to Wurts.  (*See id.* ¶ 18 (citing Online Activity Spreadsheet 2)).

during the registration for online banking, (Suppl. Nelson Decl. ¶ 13; Online Activity Spreadsheet 1 at 1)—is Wurts's phone number.[4]  In sum, the evidence submitted by Wells Fargo blatantly contradicts Wurts's claims that he "did not enroll in online banking on May 19, 2025," (Wurts Decl. ¶ 16), and "was never presented with any Online Access Agreement," (*id.* ¶ 19).  Wurts assented to the OAA, and he is therefore bound by its terms, and his declaration cannot create an issue of fact to avoid its arbitration provisions.  *See, e.g.*, *Saleh v. Digital Realty Tr., Inc.*, No. 21-CV-9005, 2022 WL 3139733, at *5–*6 (S.D.N.Y. Aug. 5, 2022) (rejecting plaintiff's efforts to "discredit the digital records evidencing that he signed the [arbitration agreement]"); *Werman v. Nordstrom, Inc.*, 817 F. Supp. 3d 156, 163 (E.D.N.Y. 2025) ("Werman's conclusory denial of computer use—which cites to no other evidence and is plainly contradicted by all the evidence submitted by Nordstrom—cannot create a factual dispute[.]").

By contrast, for the DAA, Wells Fargo has not put forth sufficient evidence to demonstrate Wurts's assent.  While Wells Fargo offers some evidence that demonstrates that Wurts *could have* used a device presenting with an Akamai IP address to apply for his account, Wells Fargo has not set forth any evidence tying that Akamai IP address to Wurts.  Wells Fargo asserts that a mobile device associated with Wurts "presented to Wells Fargo with IP addresses associated with *both* T-Mobile *and* Akamai, depending on

---

[4] In his opposition to the sealing motion, Wurts makes a cursory argument that Wells Fargo improperly submitted evidence for the first time on reply.  (*See* Pl.'s Mot. to Seal Opp'n at 1).  Wells Fargo's reply evidence "properly address[es] new material issues raised in the opposition papers," and the Court may therefore rely upon it to resolve the motion.  *See Pager v. Greater N. Ins. Co.*, No. 24-0813, 2025 WL 855846, at *5 (2d Cir. Mar. 19, 2025).  Wurts did not move for leave to file a sur-reply, or make any claim that he had any contrary evidence if given an opportunity to proffer it.  *See id.*

the login session," (Suppl. Nelson Decl. ¶ 18), but all that demonstrates is that a T-Mobile user with an iPhone running an Akamai VPN completed the online application process—not that it was Wurts. Factual issues remain about whether Wurts assented to the DAA at this juncture. However, because the OAA's arbitration provision is broad enough to encompass all of Wurts's claims, the Court need not decide whether Wurts assented to the DAA in order to resolve the motion.[5]

"Just as the parties may elect through their contract to have arbitrators (rather than a court) resolve categories of disputes between them, they may similarly contract to have arbitrators (rather than a court) decide whether a particular dispute is to be arbitrated under the terms of the contract." *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 316 (2d Cir. 2021) (quotations omitted). "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *Id.* at 317 (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)) (cleaned up). But "[w]hen the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019).

---

[5] As explained *infra*, by virtue of the OAA's delegation clauses, the OAA covers all of the parties' disputes—including those regarding the scope and enforceability of the agreement. Should the arbitrator conclude that any of Wurts's claims are outside the scope of the arbitration provision, Wells Fargo may ask to lift the stay and seek an evidentiary hearing to attempt to compel enforcement of the DAA. *See Barrows*, 36 F.4th at 49 ("[I]f there is a disputed question of material fact, such that 'the making of the arbitration agreement . . . [is] in issue,' then 'the court shall proceed summarily to the trial thereof.'" (quoting 9 U.S.C. § 4)).

The OAA clearly and unmistakably delegates the decision of whether a dispute is a "Covered Dispute" to the arbitrator: "whether a disagreement is a 'dispute' subject to binding arbitration" is itself a "Covered Dispute" subject to arbitration. (2024 OAA at 34–35);[6] *see, e.g.*, *Stock v. Wells Fargo*, No. 22-CV-0763, 2023 WL 5505839, at *7 (C.D. Cal. July 13, 2023) ("[T]he plain language of the OAA's 'Dispute Resolution Program' delegates to the arbitrator the authority to interpret the agreement and decide whether a disagreement between the parties is a 'dispute' subject to binding arbitration. In turn, the OAA clearly and unmistakably delegates questions of arbitrability to the arbitrator."). Accordingly, whether Wurts's claims fall within the scope of the OAA arbitration clause is a question for the arbitrator, not the Court.

### B.    Unconscionability

Wurts contends that the arbitration agreement as a whole is procedurally and substantively unconscionable. (*See* Pl.'s Opp'n at 25–26). The OAA also delegates those questions to the arbitrator—stating "[t]he Arbitrator will decide any dispute regarding the enforceability of this Arbitration Provision." (2024 OAA at 35). In *Rent-A-Center*,

---

[6] Wells Fargo relies upon the 2024 OAA, (*see, e.g.*, Def.'s Mot. to Compel Arb. at 6 nn.21–24 (citing the 2024 OAA's arbitration terms and definitions)), and does not seek to enforce the later versions, stating that "[a]lthough the OAA has changed in certain ways" since Wurts enrolled in online banking, "provisions therein relating to arbitration and waivers of class action rights have not changed," (Nelson Decl. ¶ 14; *see also* Def.'s Mot. to Compel Arb. at 7 n.29). Accordingly, the Court relies upon the 2024 OAA. The Court notes however that later versions, though stating that an arbitrator decides "whether a disagreement is a 'dispute' subject to binding arbitration," (*see, e.g.*, May 22, 2025 OAA, attached to Nelson Decl. as Ex. 2, Dkt. No. 41-3 §§ 20(a),(c)), also provide: "All issues are for the arbitrator to decide, *except that issues relating to the scope and enforceability of this Arbitration Provision or whether a dispute can or must be brought in arbitration are for a court of competent jurisdiction to decide*," (*id.* § 20(d) (emphasis added)).

*West, Inc. v. Jackson*, the Supreme Court explained that there are two types of challenges to arbitration agreements: the first type challenges "specifically the validity of the agreement to arbitrate," while the second challenges "the contract as a whole, either on a ground that directly affects the entire agreement (*e.g.*, the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid." 561 U.S. 63, 70 (2010) (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2006)). This second type of challenge is a question of whether a dispute is arbitrable, and includes the question of unconscionability. *See id.* at 68–69, 72 (finding that plaintiff's unconscionability challenge "to the validity of the contract as a whole" was a "gateway question of arbitrability" properly addressed to the arbitrator based on the contract's delegation provision). When the parties' contract delegates these questions to the arbitrator, "the courts must respect the parties' decision as embodied in the contract." *Henry Schein, Inc.*, 586 U.S. at 65. The only exception is if the party challenging arbitration challenges the delegation provision specifically. *Rent-A-Center*, 561 U.S. at 72 ("[U]nless [plaintiff] challenged the delegation provision specifically, we must treat it as valid . . . and must enforce it . . . leaving any challenge to the validity of the Agreement as a whole for the arbitrator."); *Davitashvili*, 131 F.4th at 118.

Wurts contends that the OAA is procedurally unconscionable because he had no actual or inquiry notice of it. (Pl.'s Opp'n at 26). And he further contends that the agreement is substantively unconscionable because it "would force a defrauded consumer into a private forum with no class or injunctive relief" and "violate[s] public

23

policy by shielding egregious misconduct or facilitating fraud." (*Id.*). Wurts's unconscionability challenges are general, not specific to the delegation provision. *See Rent-A-Center*, 561 U.S. at 66, 68 (finding delegation clause which provided "[t]he Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable" encompassed unconscionability challenge); *e.g.*, *Hu v. Whaleco, Inc.*, 779 F. Supp. 3d 265, 298 (E.D.N.Y. 2024) (collecting cases). As such, his unconscionability challenge must be decided by an arbitrator in the first instance, not this Court. *E.g.*, *Davitashvili*, 131 F.4th at 119 ("Plaintiffs argue that arbitration *in general* would be unconscionable. Our precedents require something more: Plaintiffs must show why allowing an arbitrator—as opposed to a court—to decide the question of arbitrability would be unconscionable. . . . Because Plaintiffs have not specifically challenged the delegation clause, we hold that their claims against Uber and Postmates should be sent to an arbitrator to determine whether those claims are arbitrable."); *Greene v. Kabbalah Ctr. Int'l, Inc.*, 625 F. Supp. 3d 3, 18 (E.D.N.Y. 2022) ("The law is clear that absent a specific challenge, the delegation of the questions of unconscionability and enforceability of an arbitration agreement to an arbitrator must be upheld."); *Vargas v. Bay Terrace Plaza LLC*, 378 F. Supp. 3d 190, 196–97 (E.D.N.Y. 2019) (holding that plaintiffs' unconscionability challenges "must . . . be addressed by an arbitrator in the first instance" where the plaintiffs did not raise a "specific challenge" to the delegation clause).

In sum, because Wurts assented to the OAA, the Court grants Wells Fargo's motion to compel arbitration.  And because the OAA delegates questions of scope and enforceability to the arbitrator, Wurts's scope and unconscionability challenges must be resolved by the arbitrator in the first instance.

## II.      Motion to Seal

Wells Fargo also moved to seal several exhibits submitted in support of its motion to compel arbitration.  (Def.'s Mot. to Seal).  However, Wells Fargo only sought to seal these documents because Wurts had allegedly raised privacy concerns about the filing of papers containing his address and other personal information.  (*Id.* at 1).  Wurts, however, filed an opposition indicating that he "has no objection to public filing and sees no basis for sealing," as the materials sought to be sealed are "overwhelmingly public records gathered from online sources, together with purported Wells Fargo records."  (Pl.'s Mot. to Seal Opp'n at 1).  In any event, the materials at issue are judicial documents entitled to a "presumption of public access" since they were "filed on a federal court's docket in the ordinary course of litigation" and are "relevant to the performance of the judicial function and useful in the judicial process."  *Giuffre v. Maxwell*, 146 F.4th 165, 175–76 (2d Cir. 2025) (quotation omitted).  Accordingly, the motion to seal is denied.  The Clerk of Court is directed to unseal the exhibits filed at docket number 42.

CONCLUSION

For the reasons explained above, Wells Fargo's motion to compel arbitration is granted, and its motion to seal is denied.  Wells Fargo and Wurts are directed to

25

proceed in arbitration, and the case is stayed. *Edmundson*, 85 F.4th at 702 ("[The FAA] requires federal courts, upon application of a party to the contract, to stay adjudication of claims covered by an enforceable arbitration agreement until such arbitration has been had."). The Clerk of Court is directed to administratively close this case. *Zimmerman v. UBS AG*, 789 F. App'x 914, 916 (2d Cir. 2020) ("As a result, the district court's order to 'close' the case with leave to reopen within 30 days of the conclusion of arbitration proceedings functionally amounted to a stay of the proceedings, notwithstanding that the case would end if the parties chose not to reinstate it."); *see also Bernardino v. Barnes & Noble Booksellers, Inc.*, 763 F. App'x 101, 103 (2d Cir. 2019) ("[T]his Court has previously determined that there is 'no jurisdictional significance to [a] docket entry marking [a] case as 'closed,' which we will assume was made for administrative or statistical convenience.'"(quoting *Filanto, S.p.A. v. Chilewich Int'l Corp.*, 984 F.2d 58, 61 (2d Cir. 1993))).

SO ORDERED.

*/s/ Sanket J. Bulsara*
SANKET J. BULSARA
United States District Judge

Date:  July 16, 2026
         Central Islip, New York

26